UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| KATIANA SOENEN,<br>    Plaintiff,<br><br>v.<br><br>BROWN UNIVERSITY,<br>    Defendant. | )<br>)<br>)<br>)<br>)   C.A. No. 23-cv-046-JJM-PAS<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Chief Judge.

Plaintiff Katiana Soenen was a student at Brown University when she experienced two unrelated incidences of sexual harassment in two different off-campus residences. She reported these incidents to Brown, whose Title IX Office responded and supported her toward a resolution. Unsatisfied with Brown's response, Ms. Soenen stopped communicating with Brown in the month after the second incident and filed this lawsuit, alleging violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681-88, and the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112 *et seq.*, along with several state-law claims. After motion practice reduced Ms. Soenen's case to three post-assault Title IX counts (I-III), one post-assault RICRA count (XI), and a state-law Intentional Infliction of Emotional Distress (IX) ("IIED") claim, Brown moves for summary judgment on all remaining claims. ECF No. 78.

I.     **FACTS**

Ms. Soenen was a student at Brown University when, in May 2021, she was assaulted by John Doe and in June, an unknown person assaulted her in an off-campus apartment.

Ms. Soenen contacted the SHARE[1] Advocate soon after for support and a meeting was arranged for the next day. ECF No. 81 ¶¶ 31-39. She expressed her desire to remain anonymous so the SHARE Advocate advised her that she would submit an anonymous report of the assault to the Title IX Office. *Id.* ¶¶ 35-39. The SHARE Advocate scheduled an intake meeting with the Title IX Office. *Id.* ¶ 40. Because Brown's Title IX Program Officer Rene Davis was leaving her position at the end of May, with Ms. Soenen's approval, another member of the Title IX Office staff, Jeana Horton, was present with Ms. Davis for the intake meeting to ensure continuity. *Id.* ¶¶ 41-42. Ms. Davis and Ms. Horton met with Ms. Soenen to hear her report and discuss available options, such as academic accommodations, a no-contact order, counseling support, and the option to file a formal complaint under the SGBM (Sexual and Gender-Based Misconduct) Complaint Procedure and proceed with either its formal or informal resolution processes. *Id.* ¶¶ 43-63.

Ms. Soenen testified that Brown should have told her about a no-contact order but the record shows that Brown did discuss such an order several times. *Id.* ¶¶ 46, 47, 51, 59. It is undisputed that Ms. Soenen wanted to maintain her anonymity,

---

[1] The SHARE (Sexual Harassment and Assault Resources and Education) program and its advocates provide students with a confidential resource and any information a student shares is not shared with Brown. *Id.* ¶¶ 21-23.

which would not be possible with an order in place because Mr. Doe would have to know who she was to avoid violating it. Ms. Soenen decided against a no-contact order. *Id.* ¶¶ 50-51. In that meeting, Ms. Davis discussed the option of a feedback conversation, which was not part of an official Brown policy but was an intervention technique that she had used during her tenure. *Id.* ¶¶ 54-56. Ms. Davis explained that she would meet with Mr. Doe to tell him that a student reported his conduct. *Id.* ¶¶ 61, 64-65. Ms. Soenen consented to Ms. Davis's feedback conversation with Mr. Doe. *Id.* ¶ 58. She argues now that she believed that the conversation would lead to an informal investigation; but in a follow-up email to Ms. Soenen confirming her appointment with Mr. Doe, Ms. Davis noted that "[t]his feedback conversation is not a complaint resolution option, meaning you can still pursue an informal resolution or formal resolution process [under the SGBM Complaint Procedure] at a future date." *Id.* ¶ 61.

Ms. Davis and Ms. Horton met with Mr. Doe for the feedback conversation. *Id.* ¶¶ 64-66. Ms. Davis emailed Ms. Soenen to update her and once again told her that the conversation was not a formal complaint or part of a resolution process. *Id.* ¶ 66. Mr. Doe left a voicemail with the Title IX Office stating that he wanted to apologize to the reporting student and asked if the Title IX Office would convey his apology. *Id.* ¶ 67. Ms. Davis listened to John's apology message to ensure that it was appropriate, and asked Ms. Soenen if she wanted to hear it. *Id.* ¶ 68. She agreed to receive his apology and Ms. Davis transcribed it into an email to her. *Id.* ¶ 71. Ms. Soenen was

3

insulted by Mr. Doe's apology. *Id.* ¶ 74. Though she knew it was her choice to file a complaint against Mr. Doe, Ms. Soenen did not do so. *Id.* ¶¶ 76-77.

About a month later, Ms. Soenen was assaulted by an unidentified person at an off-campus apartment.[2] *Id.* ¶ 80. She went to Brown Department of Public Safety ("DPS") and the SHARE Advocate who provided her with assistance, support, and resources. *Id.* ¶¶ 82-85, 103-105. She also got the Providence Police involved who concurrently conducted a law enforcement investigation. *Id.* ¶¶ 95-101, 146-47. Brown's DPS facilitated her connection with the Providence Police's Special Victims Unit. *Id.* ¶¶ 101, 115, 130. She gave her evidence to the Providence Police for its investigation, including clothing that she wore to the party for a forensic examination. *Id.* ¶¶ 100, 110, 147.

The record shows that Brown's response was complicated because she could not identify the accused party. *Id.* ¶¶ 85, 103-105. Ms. Soenen met with Ms. Horton and reported her limited memory of the assault, as well as allegations that she had heard from others that students living in the off-campus residence may have been operating an unrecognized fraternity. *Id.* ¶¶ 84-88, 103-105. Ms. Horton discussed with Ms. Soenen about whether she would be able to proceed under the SGBM Complaint Procedure because an accused person must be able to respond to the complaint. *Id.* ¶¶ 89-92. Ms. Horton could not advise Ms. Soenen of how sure she needed to be about her attacker's identity before proceeding with a formal complaint against a respondent. *Id.* ¶¶ 92-93, 103-105. Ms. Soenen felt like Ms. Horton was

---

[2] The parties refer to this individual as James Roe so the Court will as well.

4

giving her the run-around by failing to give her the guidance she sought in this circumstance where she did not know who assaulted her.

After their last meeting, Ms. Horton contacted Dean Yolanda Castillo-Appollonio of the Office of Student Conduct and Community Standards ("OSCCS") because the alleged attack took place at an off-campus premises that may have been operating as fraternity, which fell under OSCCS's jurisdiction and could constitute violations of Brown's Code of Student Conduct. *Id.* ¶¶ 106-108. Ms. Horton connected Ms. Soenen and Dean Castillo-Appollonio, so that she could receive and review Ms. Soenen's report about alleged prohibited conduct at the off-campus residence. *Id.* This investigation was aimed at addressing "broader issues" related to the off-campus activities but could produce useful information for the assault investigation and assist in identifying Ms. Soenen's assailant. *Id.* ¶¶ 121, 154.

The SHARE Advocate continued to reach out to Providence Police to confirm that law enforcement had received Ms. Soenen's evidence and to get further updates. *Id.* ¶¶ 109-116. The Title IX Office continued to communicate with her about Brown policies, including her right to file a formal complaint, and available supportive measures. *Id.* ¶ 117. Ms. Soenen informed OSCCS that she thought that a Brown student, James Roe, could have been the person who assaulted her. *Id.* ¶ 119. She decided not to file a formal complaint against Mr. Roe because she was not sure he was her attacker. *Id.* ¶ 120. She requested no-contact orders against Mr. Doe, from the May incident, and Mr. Roe, which OSCCS issued. *Id.* ¶¶ 133-36. OSCCS investigated her allegations of the off-campus apartment activities and, among other

5

things, learned that Mr. Roe was not in Providence on the evening of the assault. *Id.* ¶¶ 137-142. OSCCS shared this information with Ms. Soenen, but she believed he could have arrived at the party in the early morning hours of the next day. *Id.* ¶ 143.

After a couple of additional meetings and conversations with Brown staff, Ms. Soenen decided that she would sue Brown. *Id.* ¶¶ 153-159. Ms. Soenen took a leave of absence from Brown in August 2021. *Id.* ¶¶ 162, 170. In the meantime, Brown provided academic accommodations to enable her to complete her course requirements for the summer 2021 semester. *Id.* ¶¶ 165-167. She ended up extending her leave through the entire 2021-2022 school year and petitioned for reinstatement for the next academic year, which Brown granted, but opted to transfer to another school. *Id.* ¶¶ 170-171, 174- 177.

## II.   STANDARD OF REVIEW

A party is entitled to summary judgment if the movant shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party can show a genuine dispute by citing to materials in the record, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials," or by showing that the materials cited either do not establish a genuine dispute or are not supported by admissible evidence. *Id.* Summary judgment is mandated against a party who, given adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case … on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A complete failure of proof of an essential element shows that there is "no genuine issue as to any material fact" because if one element fails, all other facts are rendered irrelevant; it entitles the moving party to "judgment as a matter of law" because, by definition, the nonmoving party cannot carry their burden at trial. *Id.* at 323.

### III. DISCUSSION

Brown argues in its motion that there are no material issues of disputed fact on Ms. Soenen's remaining claims for gender discrimination and IIED such that this Court should decide in its favor as a matter of law. Ms. Soenen argues that there are many material disputes in this case that are better suited to a jury's determination. The law the Court is to apply here is generally not in dispute. The Court's brief discussion of the guiding legal principles and its highlighting of the material facts in the record follows.

#### A. Title IX (Counts I, II, III) and RICRA (Count XI)[3]

To succeed on a "deliberate indifference" claim, a plaintiff must show that (1) "she was subject to 'severe, pervasive, and objectively offensive' sexual harassment"; (2) "the harassment caused the plaintiff to be deprived of educational opportunities

---

[3] Rhode Island courts look to federal law in construing their analogous civil rights statutes, *Doe v. Brown Univ.*, 43 F.4th 195, 206 (1st Cir. 2022); *see Colman v. Faucher*, 128 F. Supp. 3d 487, 491 n.8 (D.R.I. 2015) (citing *Casey v. Town of Portsmouth*, 861 A.2d 1032, 1037 (R.I. 2004)), so the Court will analyze these claims together.

or benefits"; (3) the funding recipient was aware of such harassment; (4) the harassment occurred "in [the funding recipient's] programs or activities"; and (5) the funding recipient's response, or lack thereof, to the harassment was "clearly unreasonable." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-50 (1999)).

"[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference; in the Title IX context, 'funding recipients are deemed deliberately indifferent to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Id.* at 73 (quoting *Davis*, 526 U.S. at 648). Deliberate indifference is a "stringent standard of fault, requiring proof that a[n] . . . actor disregarded a *known or obvious* consequence of his action" or inaction. *Bd. of the Cnty Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (emphasis in original).

Brown assumes without conceding that Ms. Soenen has met the first four elements and argues that its response was not clearly "unreasonable in light of the known circumstances," that is, it was not deliberately indifferent to Ms. Soenen's two reports of sexual harassment. The Court looks to the undisputed facts in the record of what Brown did in response to her reports against both Mr. Doe and Mr. Roe and the record shows that Brown responded to Mr. Soenen's reports and followed up consistently.

Regarding her May report, meetings with her SHARE Advocate and Title IX staff were scheduled right away and her desire for anonymity was respected. The

8

Title IX staff communicated Brown's policies, resources, and what her options were. Meeting records confirm that Ms. Soenen was offered a no-contact order but denied the need for one because Mr. Doe was a year ahead of her at Brown and she did not expect to interact with him. She also would have had to disclose her identity if such an order issued. Ms. Soenen agreed that Ms. Horton should attend her meetings with Ms. Davis, agreed to Ms. Davis having a feedback conversation with Mr. Doe, and agreed to receive Mr. Doe's apology. While she asserts that she was misled that the feedback conversation was part of the informal process, the communications between Ms. Soenen and Brown show that Brown consistently explained to her that the feedback conversation did not replace an informal or formal resolution process. And Ms. Soenen testified that she knew it was her choice whether to file a complaint against Mr. Doe under the SGBM Complaint Procedure, which she never did.[4] These undisputed facts do not support a finding of deliberate indifference.

Ms. Soenen also argues that Brown's response to the May assault was deliberately indifferent because Brown rushed to resolve the complaint because Ms. Davis was leaving her job. But there is no evidence that Ms. Davis's departure affected the timing or schedule of Brown's response. Expecting that the process might go beyond her tenure, Ms. Davis brought in another staff member, with Ms. Soenen's

---

[4] Ms. Soenen explains that her decision to not pursue a complaint against Mr. Doe was in part based on the fact that, as she was going through the process, she was attacked in June and was more focused on that traumatic event. This is a sad reality but there is no evidence that Brown's conduct–deliberately indifferent or otherwise– led to the feedback conversation and email being the final resolution to the May assault.

9

consent, as part of the process to ensure continuity in the case. And Ms. Davis continued to be available to Ms. Soenen in the days after her departure date if she needed anything. ECF No. 81 ¶ 70. She also argues that Ms. Davis dissuaded her from filing a formal complaint. But the record shows that Ms. Davis could not have been clearer that her feedback conversation with Mr. Doe, which occurred with Ms. Soenen's permission, did not preclude her from filing a formal or informal complaint. Ms. Soenen also cites Ms. Davis's insensitivity to her by assessing Mr. Doe's email apology as "appropriate" and "affirming." *Id.* ¶¶ 67-73. Ms. Davis explained in her deposition, however, that she merely meant that his response "appropriately" addressed the issues, and he "affirmed" that he understood the seriousness of the feedback conversation. So, while Ms. Soenen may not have appreciated Mr. Doe's apology or the words Ms. Davis used to describe it, Ms. Davis's actions were not clearly unreasonable and cannot be said to be deliberately indifferent.

As for her reports about the second assault, Brown responded with similar alacrity. Staff met with Ms. Soenen and offered her resources, academic accommodations, and support. She requested the entry of no-contact orders against Mr. Doe and Mr. Roe, which were promptly issued. Her SHARE Advocate met with her and sent follow-up communications about her case with the Providence Police and interactions with OSCCS. Brown approved and extended Ms. Soenen's leave of absence request. Brown granted her petition to return to the University for the 2022-

2023 academic year, but she decided to transfer to another university where she worked very hard to achieve her degree on time.

It is true that the investigation into the June assault and Title IX process were hamstrung by the fact that Ms. Soenen, through no fault, could not identify her attacker. Ms. Horton took time to review and consider whether Ms. Soenen would be able to proceed under the SGBM Complaint Procedure, given that the assailant's name was required to file a formal complaint. Ms. Horton could not provide Ms. Soenen with how sure she needed to be about her attacker's identity to file a complaint. Ms. Soenen ultimately did name James Roe, but he provided evidence that he was not on Brown's campus that evening. While this exposed a potential scenario not contemplated by Brown's policies, Ms. Horton's cautious advice to Ms. Soenen was not deliberately indifferent.

Ms. Soenen also argues that Ms. Horton was deliberately indifferent when she sent her to Dean Castillo-Appollonio of OSCCS to provide OSCCS with information about underaged drinking and an unsanctioned fraternity at the off-campus premises. She perceived this referral to OSCCS, who she contends had no intention of trying to find out who attacked her, as a way to brush her off and minimize the severity of her situation. OSCCS worked with Ms. Soenen, and interviewed people who were at the off-campus house in an effort to address off-campus issues, but with the hope that it could get useful information about the assailant's identity. While she may have felt working with OSCCS was a waste of time and did not help the

11

investigation, Ms. Horton's decision to get them involved was not deliberately indifferent.

Based on the record evidence and Ms. Soenen's own testimony, it is clear that she believes that Brown should have acted differently and done more to assist her during these terrible times. But "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by [students]. The test is objective–whether the institution's response, evaluated considering the known circumstances, is so deficient as to be clearly unreasonable." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007). Considering this standard, the Court cannot say that Brown's conduct, once it learned of Ms. Soenen's reports, was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Id.* at 175. In fact, the record is undisputed that quite the opposite was true. Brown appropriately reacted to Ms. Soenen's reports in a thorough and timely fashion. Based on the undisputed facts, the Court finds that no reasonable jury could find that Brown was deliberately indifferent to Ms. Soenen's reports about Mr. Doe or Mr. Roe.

### B.   Intentional Infliction of Emotional Distress

"To create liability for intentional infliction of emotional distress in Rhode Island, '(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.'" *Doe v. Brown*

12

*Univ.*, 43 F.4th 195, 209 (1st Cir. 2022) (quoting *Swerdlick v. Koch*, 721 A.2d 849, 862 (R.I. 1998)).  To find liability, Brown's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf,* 851 A.2d 1083, 1090 (R.I. 2004) (quoting Restatement (Second) Torts § 46 (1965)).  A plaintiff must also show some "physical symptomatology resulting from the alleged improper conduct." *Vallinoto v. DiSandro*, 688 A.2d 830, 838 (R.I. 1997) (citing *Reilly v. United States*, 547 A.2d 894, 898 (R.I. 1988)).

A student "stands in a particularly vulnerable relationship vis-à-vis the university, the administration, and the faculty." *Russell v. Salve Regina Coll.*, 649 F. Supp. 391, 402 (D.R.I. 1986).  Even considering the parties' relationship, Ms. Soenen has not pointed to any evidence in the record that could rise to IIED's high standard. While she perceived her experiences with Mr. Doe and Mr. Roe negatively, and this may have been understandably devastating emotionally, the Court is only focused on Brown's conduct in marshaling her through the Title IX process.  And the undisputed facts in the record do not support a finding that Brown is liable for IIED for the way it interacted with Ms. Soenen during that process.

Ms. Soenen believes that Brown's conduct was extreme and outrageous toward her; Ms. Davis acted in a way that made Ms. Soenen believe she favored Mr. Doe. Ms. Davis "recklessly steered" Ms. Soenen toward the "feedback conversation" process with Mr. Doe and "misled" her into thinking that was part of the informal process.  When Ms. Davis asked Ms. Soenen if she wanted her to have such a

13

conversation with Mr. Doe, Ms. Soenen agreed and said she wanted to hear Mr. Doe's apology which resulted from that conversation. And Ms. Soenen testified that she knew it was her decision whether to file a complaint and she decided not to so she must have known that the feedback conversation was not the last or only resort for her.

As to the second assault in June, Ms. Soenen felt the Title IX staff "passed [her] off" to OSCCS and that ended the assault investigation because OSCCS would only investigate the underage drinking. As the Court has considered, the fact that Ms. Soenen could not identify her second attacker complicated the Title IX Office's process. It is undisputed that OSCCS was brought in because the attack happened at an off-campus apartment that was within its jurisdiction. Brown believed that involving that department, whose purview involves clubs, would aid in the identification of Ms. Soenen's attacker, which could subsequently allow Ms. Soenen to move forward with her Title IX case. And Ms. Soenen had also involved Providence Police who were also independently investigating the assault. There is no evidence that the way Brown chose to handle Ms. Soenen's reports of sexual assault and to support her after those reports, was intentional or in reckless disregard of causing her emotional distress. Nor is there any evidence that she had an "enhanced susceptibility to emotional distress" or that Brown knew of it then and chose to act in a way that was outrageous and beyond the bounds of decency. *Doe v. Brown Univ.*, 43 F.4th at 210. The Court grants summary judgment to Brown on Ms. Soenen's IIED claim.

## IV. CONCLUSION

Because the parties agree on the law governing this case and the Court has concluded that Ms. Soenen has not pointed to material disputed facts in this record that require a jury's consideration, and it is clear that Brown is entitled to judgment as a matter of law, the Court finds that summary judgment for Brown is appropriate on all remaining counts (Counts I, II, III, IX, XI). The Court GRANTS Brown's Motion for Summary Judgment. ECF No. 78.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court

October 21, 2025